UNITED STATES of America, Appellee,

v.

Carmine TRAMUNTI, Defendant-Appellant.

No. 1102, Docket 74–1398.

United States Court of Appeals, Second Circuit.

Argued June 6, 1974.

Decided July 12, 1974.

Jed S. Rakoff, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. S. D. N. Y., S. Andrew Schaffer, Asst. U. S. Atty., of counsel), for appellee.

Gretchen White Oberman, New York City (Jay Goldberg, New York City, of counsel), for defendant-appellant.

Before KAUFMAN, Chief Judge, and MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment of conviction entered on February 27, 1974, in the United States District Court, Southern District of New York, after a jury trial before Hon. Arnold Bauman, United States District Judge. The appellant, Carmine Tramunti, was convicted of six counts of giving false testimony under oath in violation of 18 U.S.C. § 1623. A seventh count was dismissed prior to trial. After an eight-day trial, the jury found Tramunti guilty on October 25, 1973, and, on February 27, 1974, Judge Bauman sentenced Tramunti to concurrent terms of five years imprisonment on each count.

The six counts charged Tramunti with lying when he testified, as a witness on his own behalf, in a 1971 trial where he was a defendant in a conspiracy, mail fraud and stock fraud case, United States v. Aloi, 70 CR. 967 (the "Imperial trial"). Tramunti was acquitted in that case but was convicted below of lying in the Imperial trial when he denied knowing and meeting five of the alleged co-conspirators in the Imperial scheme: Michael Hellerman (count 1), John Kelsey (count 2), Murray Taylor (count 3), Vincent Gugliaro (count 4) and Philip Bonadonna (count 5). The sixth count of which he was convicted charged that he had lied when he denied meeting with some of the alleged co-conspirators at Gatsby's Restaurant, where the Imperial stock fraud deal was discussed.

On the trial below, Hellerman, a self-confessed securities swindler, testified for the Government and stated that he had been introduced to Tramunti by John Dioguardi, and that prior to the Imperial trial he had met Tramunti on at least six occasions at various night clubs and restaurants, including the Royal Box Club at the Americana Hotel, where he attended a show with Kelsey and their wives. This testimony was

corroborated in part by four other witnesses. Kelsey, another self-confessed stock swindler, also testified that he had been at the Gatsby luncheon, the meeting covered in count 6, with Tramunti, Taylor, Bonadonna, Dioguardi and two men named "Vinnie". A Government exhibit, a photograph taken by an FBI agent, showed Tramunti and Gugliaro leaving a restaurant following the Fusco wedding reception in 1965.

## I COUNT 4

No question of insufficiency of evidence has been raised on this appeal except with respect to count 4 involving Tramunti's acquaintanceship with Gugliaro. It is urged that as a matter of law the FBI photograph showing the two men leaving a large wedding reception at the same time is insufficient evidence to establish that they knew each other.

The sufficiency of the Government's case, however, is not to be determined by the photograph alone. After the Government rested, the defendant's motion for a judgment of acquittal under Fed.R.Crim.P. 29, which permits the entry of a judgment of acquittal for insufficiency of the evidence, was denied. The defense then proceeded to present its case. The sufficiency of the evidence supporting count 4 must therefore be considered in conjunction with the evidence presented by the defense. United States v. Pui Kan Lam, 483 F.2d 1202, 1208 n. 7 (2d Cir. 1973); United States v. Arcuri, 405 F.2d 691, 695 n. 7 (2d Cir. 1968), cert. denied, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969). In the Imperial trial, Tramunti had testified that he had no recollection of ever having been at the restaurant in question and did not know of any wedding reception having been held there. On his direct examination below, Tramunti's memory improved to the point that he was able to recall that several

hundred people were at the reception. On cross-examination (during the course of which the Government confronted Tramunti with his earlier testimony), he recalled that he was present and was able to identify both himself and Gugliaro in the photograph. He still denied having met or spoken to Gugliaro. The jury, having listened to Tramunti's testimony and having heard his prior testimony about the wedding given at the Imperial trial, may well have believed that his denial that he knew Gugliaro was a fabrication. This was clearly a permissible inference, Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952) (L. Hand, J.), and, in view of his conviction, the inferences to be drawn must be considered in the light most favorable to the Government. United States v. Candella, 487 F.2d 1223, 1228 (2d Cir. 1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974); United States v. Marrapese, 486 F.2d 918, 921 (2d Cir. 1973), cert. denied, 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974). Furthermore, the evidence on this count must be viewed in light of the totality of the Government's case, since one fact may gain color from others. United States v. Taylor, 464 F.2d 240, 244 (2d Cir. 1972); United States v. Monica, 295 F.2d 400, 401–402 (2d Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962). We therefore cannot conclude that the evidence with respect to count 4 was insufficient to justify the verdict.

## II THE IMMUNITY CLAIM

The cross-examination of Tramunti provides the basis for the principal argument made on this appeal. In 1966, Tramunti was subpoenaed as a witness before a federal grand jury. He refused to answer any questions, pleading the fifth amendment. Pursuant to 18 U.S.C. § 1406,[1] a court order was obtained

---

1. 18 U.S.C. § 1406 provided:

 Whenever in the judgment of a United States attorney the testimony of any witness, or the production of books, papers, or other evidence by any witness, in any

 case or proceeding before any grand jury or court of the United States involving any violation of [certain specified offenses] is necessary to the public interest, he, upon the approval of the Attorney Gener-

compelling his testimony but granting him immunity from the use of his testimony against him in any court. This grant of use immunity, as Judge Bauman found, was not known either to defense counsel below, who had never previously represented Tramunti, or to Government counsel in this trial. On his cross-examination in this case, the Government read to Tramunti and asked him to account for his sworn testimony before the 1966 grand jury that he did not know what John Dioguardi, his friend of more than 20 years, did for a living and that he could not remember any of his own occupations of some two or three years before. Tramunti did recall at the trial below that Dioguardi was associated with Jard Products, and further did testify as to what his own occupations had been in 1963 and 1964. (On redirect examination, Tramunti testified that he did not know Dioguardi's occupation in 1966, but learned about it between 1966 and 1971). There is no question but that this evidence was relevant—the Government was seeking to impeach Tramunti's credibility as a witness on trial (by showing his ability to remember on this trial facts which he could not remember in 1966), and also to demonstrate prior similar acts (i. e., his wilful and intentional giving of false trial testimony in the 1971 Imperial case, which was the basis of his present in-

dictment, was preceded by similar conduct before the grand jury).

Counsel for Tramunti objected to the admission of this evidence on trial on the ground of remoteness, and, on a post-trial motion under Fed.R.Crim.P. 33, on the ground that the 1966 grand jury evidence was inadmissible because of the use immunity which was provided by § 1406 and by the self-incrimination clause of the fifth amendment of the Constitution. The immunity issue remains the major argument on this appeal. Judge Bauman, in a decision read into the record, denied the post-trial motion for a new trial.

**A. Applicability of Indiviglio**

■■ The court below held initially that since defense trial counsel had failed to make a specific, timely objection to the allegedly immunized testimony, even though the defendant's constitutional rights were involved, the error would not be noticed under United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). The court went on to state that, absent specific objection, the use of the evidence here did not amount to an injustice of sufficient magnitude to warrant invocation of the plain error rule.[2] United States v. Bryant, 480 F.2d 785 (2d Cir. 1973).

al, shall make application to the court that the witness shall be instructed to testify or produce evidence subject to the provisions of this section, and upon order of the court such witness shall not be excused from testifying or from producing books, papers, or other evidence on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture. But no such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding (except prosecution described in the next sentence) against him

in any court. No witness shall be exempt under this section from prosecution for perjury or contempt committed while giving testimony or producing evidence under compulsion as provided in this section.

This section was repealed in 1970 and replaced by 18 U.S.C. § 6002. The statute repealing § 1406 provided that repeal would not affect any immunity to which a person was entitled under a repealed provision by reason of any testimony given before the repeal date. Organized Crime Control Act of 1970, Act of Oct. 15, 1970, Pub.L.No.91-452, § 260, 84 Stat. 932.

2. Fed.R.Crim.P. 52(b) provides:
Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

We cannot agree that *Indiviglio* is applicable here. In that case, experienced trial counsel had objected to the introduction into evidence of statements made by the defendant on the ground that he had been illegally brought into the country by federal agents. The objection was overruled. On appeal, it was argued that the statements had been admitted in violation of the defendant's sixth amendment right to counsel under Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and, Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). These decisions had been handed down by the Supreme Court in May and June, 1964, and the defendant's trial was conducted in October, 1964. In *Indiviglio*, this court twice commented upon the fact that experienced trial counsel should have been expected to note these opinions and evaluate their relevance. 352 F.2d at 279, 281. In United States v. Bryant, *supra*, also relied upon by the trial court, the appellant urged that a tape played at a trial before a jury should not have been admitted because the recording was inaudible. No objection was made on this ground either before or after the tape was played to the jury. We held that the appellant was not entitled as a matter of right to raise the issue on appeal. 480 F.2d at 789.

To the extent that *Indiviglio* is based on a theory of waiver, we do not think it controls, for we can find no waiver here. It is not disputed that trial counsel was actually unaware that the Tramunti 1966 grand jury testimony was immunized. Although trial counsel here was experienced and able, he had not represented Tramunti before. The Government argues that the appellant himself, the unwilling witness, obviously must have known that he was the beneficiary of whatever immunity he was granted. Although Tramunti is hardly a stranger in the criminal courts, we are loathe to attribute to him the legal sophistication necessary to appreciate, particularly while the subject of a vigorous cross-examination, the circumstances under which he testified in 1966, seven years before. As Judge Bauman noted on sentencing, Tramunti has lived his "adult life entirely outside the law". His appearance in criminal proceedings was hardly of such moment that he could be reasonably expected to recall readily what, if any, cloak of immunity he was wearing in 1966. See United States ex rel. Raymond v. Illinois, 455 F.2d 62, 66–67 (7th Cir. 1971), cert. denied, 409 U.S. 885, 93 S.Ct. 103, 34 L.Ed.2d 141 (1972).

The Government argues, however, that *Indiviglio* does not rest upon the waiver theory; rather, the Government contends, it is bottomed upon the realization that the defense and the Government will inevitably suffer innocent lapses in perception during a trial which will preclude the court from noticing and correcting errors, *and* where the prejudice is so substantial as to result in fundamental unfairness, only then is a new trial warranted. Here, Judge Bauman found that no such grave injustice warranting invocation of the plain error rule occurred. It is also argued that the error is not "plain" since the immunity question involved here is "close."

We do not agree. As we have noted, this court in *Indiviglio* did emphasize that defense counsel should have made the objection on trial since he ought to have been familiar with previously decided major cases in the Supreme Court upon which his subsequent appellate position was based. In *Bryant*, the inaudibility of the tapes was again immediately determinable at trial and this factor was noted on the appeal. Two additional cases are cited on appeal by the Government to establish that a "close" legal question does not constitute plain error, United States v. Manning, 448 F.2d 992, 1000, 1002 (2d Cir.) (*en banc*), cert. denied, 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971), and United States v. Wright, 466 F.2d 1256, 1259 (2d Cir. 1972), cert. denied, 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973). *Manning* involved the question of probable cause for making an arrest and seizure

of narcotics in an apartment occupied by the appellant. On appeal, appellant urged for the first time that even if probable cause existed, the agent did not make a "sufficient announcement" to justify kicking the apartment door open. While the point is not mentioned explicitly in the opinion, it seems obvious that this was a case in which the issue on appeal could well have been made below. There was no suggestion whatsoever that the facts or the law involved came as any surprise to trial counsel. *Wright* is even less supportive of the Government's position. There, the appellant for the first time on appeal raised the question of the constitutionality of the federal wiretap statute. In relying upon *Indiviglio*, this court specifically noted the "striking" failure of the appellant to raise the issue on trial, particularly since counsel had reserved the right to raise the wiretap issue pending discovery but failed to move to suppress after receiving it. 466 F.2d at 1259.

In short, the "close question" approach taken in both of these cases in refusing to apply the plain error rule was in a setting of inadvertence or neglect on the part of trial counsel below. The case before us is markedly distinguishable. Not only was there no inadvertence or neglect on the part of trial counsel, but, in addition, the Government was culpable for the failure of trial counsel to make the appropriate specific objection. There is no suggestion that the Government deliberately suppressed the fact of appellant's 1966 immunity. It was found below and is not contested by appellant that trial counsel for the Government was as ignorant as defense counsel. However, the reason for the Government's lack of knowledge, as revealed in its affidavit on the Rule 33 motion below, was that the grand jury transcript upon which it relied failed to disclose that the Tramunti testimony was immunized. Since the Government obviously intended to use the 1966 transcript in the trial below, we do not think it unreasonable to expect that it should have made the inquiry before the trial rather than after, when it was advised by defense counsel that he believed the testimony may have been immunized. The grand jury transcript was available to the Government, and if it intended to use it and knew or should have known that the testimony recorded therein had been immunized, this should have been brought to the attention of defendant's counsel in order to permit the raising of the specific question.

What we have here, in sum, is the reverse of *Indiviglio*—the failure to use a reasonable degree of care, in our view, was the fault of the Government and not of defense counsel. The perjury charges here were not based on the 1966 grand jury testimony but on the testimony given in the Imperial trial of 1971. We cannot expect clairvoyance on the part of defense counsel,[3] nor, as we have indicated, legal acumen on the part of the

---

3. Defense counsel cannot fairly be penalized for failure to raise at trial an issue of which he was, without his own fault, ignorant. Cf. Dallago v. United States, 138 U.S.App.D.C. 276, 427 F.2d 546, 554–555 (1969) ; Osborne v. United States, 351 F.2d 111, 116 (8th Cir. 1965) ; United States v. Grady, 185 F.2d 273, 274 (7th Cir. 1950) ; United States v. Douglas, 155 F.2d 894, 896 (7th Cir. 1946). See also Leary v. United States, 395 U.S. 6, 27–28 (1969) ; United States ex rel. O'Connor v. New Jersey, 405 F.2d 632, 634 n. 2 (3d Cir.), cert. denied, 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969) ; United States ex rel. Daskal v. Nena, 361 F.2d 178, 180 n. 1 (2d Cir.), cert. denied, 385 U.S. 874, 87 S.Ct. 150, 17 L.Ed.2d 102 (1966).

In United States v. Hart, 407 F.2d 1087, 1089 (2d Cir.), cert. denied, 395 U.S. 916, 89 S.Ct. 1766, 23 L.Ed.2d 231 (1969), this court said :

Normally the failure to raise a constitutional question by a proper objection at trial forecloses consideration of that question on appeal. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). However, where a constitutional ground recognized for the first time in a Supreme Court decision is to be given retroactivity, the blind application of *Indiviglio* would be unduly harsh where the principle was unknown to counsel at the time of trial.

defendant. By the same token, we do not think that the "close question" approach of *Manning* and *Wright* to the plain error doctrine is appropriate here. The appellant claims a serious infringement of fifth amendment and statutory rights which are fundamental in our system of criminal jurisprudence. Moreover, this important issue was raised by defense counsel at the earliest possible time, in the Rule 33 motion, and has been fully briefed and argued on this appeal. We think that simple justice requires that we meet this issue squarely. We therefore do not consider *Indiviglio* applicable.

Thus we come to the real issue on appeal: were Tramunti's fifth amendment and statutory rights to use immunity violated below? The transcript of the immunized testimony before the grand jury was used in a subsequent criminal case against the interests of the unwilling witness. However, we agree with Judge Bauman's conclusion that this violated neither the constitutional nor the statutory rights of the appellant.

### B. *The Constitutional Question*

■■ The power of the Government to compel testimony is unquestioned, but the power is not absolute. The most important exemption from the obligation of a witness to testify is the fifth amendment privilege against compulsory self-incrimination. The accommodation between the right of the Government to compel testimony, on the one hand, and the constitutional privilege to remain silent, on the other, is the immunity statute. In Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court reiterated the constitutionality of so-called use immunity statutes, where an unwilling witness is given immunity from the use of the compelled testimony or the use of evidence derived from such testimony in subsequent criminal proceedings. The Court held then that transactional immunity, which provides an absolute bar against future prosecution for the crimes disclosed, constituted broader protection than the fifth amendment privilege required.[4]

■■ The theory of immunity statutes is that in return for his surrender of his fifth amendment right to remain silent lest he incriminate himself, the witness is promised that he will not be prosecuted based on the inculpatory evidence he gives in exchange. However, the bargain struck is conditional upon the witness who is under oath telling the truth. If he gives false testimony, it is not compelled at all. In that case, the testimony given not only violates his oath, but is not the incriminatory truth which the Constitution was intended to protect. Thus, the agreement is breached and the testimony falls outside the constitutional privilege. Moreover, by perjuring himself the witness commits a new crime beyond the scope of the immunity which was intended to protect him against his past indiscretions. This is not only a rational explanation of the accommodation between the competing interests and rights of the parties, but it is supported by authority. In Glickstein v. United States, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1911), a bankrupt was required to answer questions under oath pursuant to an immunity provision of the Bankruptcy Act of 1898 which provided without exception that no such testimony "shall be offered in evidence against him in any criminal proceeding." Glickstein, the bankrupt, was later prosecuted and

---

4. The use immunity statute held constitutional in *Kastigar*, 18 U.S.C. § 6002, is the successor of 18 U.S.C. § 1406, which is involved on this appeal. See note 1 *supra*. There is no dispute that § 1406 provided use and not transactional immunity here.

In *Kastigar*, the Court explicitly reaffirmed its prior holdings in Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), and Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), which upheld the constitutionality of immunity statutes. 406 U.S. at 448, 92 S. Ct. 1653.

convicted for perjurious statements made in the immunized proceeding, although objection was made that the use of the statements violated the language of the immunity clause. In affirming the conviction, the Supreme Court (relying, *inter alia,* on Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), reaffirmed in *Kastigar*) held that the fifth amendment did not preclude the compelling of incriminating testimony provided the immunity in all respects be commensurate with the constitutional limitation. The Court further stated:

> [I]t cannot be conceived that there is power to compel the giving of testimony where no right exists to require that the testimony shall be given under such circumstances and safeguards as to compel it to be truthful. In other words, this is but to say that an authority which can only extend to the licensing of perjury is not a power to compel the giving of testimony. Of course, these propositions being true, it is also true that the immunity afforded by the constitutional guarantee relates to the past and does not endow the person who testifies with a license to commit perjury.

222 U.S. at 142, 32 S.Ct. at 73.

Precisely the same rationale was applied in United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950), which involved the refusal of a witness at a congressional hearing to answer a question or to produce records despite an automatic immunity then provided for such witnesses. The use immunity statute at issue, 18 U.S.C. § 3486 (repealed in 1970), did have an express exception for perjury but not for the contempt proceeding which ensued upon the refusal of the witness to cooperate. While allowing that the language of the statute literally protected the defendant, the Supreme Court nevertheless reversed the circuit court which had reversed her conviction below. The Court stated:

> By granting an immunity, it was the congressional intent to compel testimony which had hitherto been unavailable.

It is now contended that the protection of the statute, which was extended to witnesses in an effort to *obtain* testimony, protects equally the person who wilfully *withholds* testimony and is prosecuted for his wilful default. This contention completely ignores the purpose of the immunity.

339 U.S. at 338, 70 S.Ct. at 734.

The Court further held:

> The debates attending enactment of the statutes here in question and the decisions of this and other federal courts construing substantially identical statutes make plain the fact that Congress intended the immunity therein provided to apply only to *past* criminal acts concerning which the witness should be called to testify. The offense of contempt of Congress, with which we are presently concerned, on the other hand, matures only when the witness is called to appear before the committee to answer questions or produce documents and wilfully fails to do so. Until that moment he has committed no crime. There is, in our jurisprudence, no doctrine of "anticipatory contempt." While the witness' testimony may show that he has elected to perjure himself or commit contempt, he does not thereby admit his guilt of some past crime about which he has been summoned for questioning but commits the criminal act then and there.

339 U.S. at 340–341, 70 S.Ct. at 735 (footnote omitted) (emphasis in original).

The rationale of *Glickstein* and *Bryan* is clear. The immunity granted by the Constitution does not confer upon the witness the right to perjure himself or to withhold testimony. The very purpose of the granting of immunity is to reach the truth, and when that testimony is incriminatory, it cannot be used against him. If the witness thwarts the inquiry by evasion or falsehood, as the appellant did here, such

conduct is not entitled to immunity.[5] In fact, another crime not existing when the immunity was offered is thereby committed. The immunity does not extend *in futuro*. United States v. Winter, 348 F.2d 204, 208–209 (2d Cir.), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965); United States v. Pappadio, 346 F.2d 5, 8 n. 3 (2d Cir. 1965), vacated on other grounds, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); People v. Tomasello, 21 N.Y.2d 143, 150, 287 N.Y.S.2d 1, 6, 234 N.E.2d 190, 193 (1967).

 Appellant argues that a total prohibition of immunized testimony is required by the fifth amendment under *Kastigar*. The question as to whether or not perjury is immunized was not before the Court in that case, which reaffirmed prior holdings of the Court that use immunity was sufficient to comply with the fifth amendment privilege. Moreover, the very statute involved in *Kastigar* did contain an exception which permitted a subsequent prosecution for perjury. This, if anything, bolsters the argument that perjured testimony is not constitutionally immunized.

Cameron v. United States, 231 U.S. 710, 34 S.Ct. 244, 58 L.Ed. 448 (1914), is relied upon by the appellant for the proposition that *Glickstein* is somehow limited. We do not see how *Cameron* aids the appellant. In that case, the Government sought to introduce truthful testimony of the immunized witness to establish that he later committed perjury in another proceeding. The truthful testimony was compelled and properly found to be inadmissible in the subsequent perjury proceeding. The distinction is clearly drawn in United States v. Hockenberry, 474 F.2d 247 (3d Cir. 1973), which cites *Kastigar* and which

emphasizes that the immunity is for truthful statements:

> But quite apart from any question of self-incrimination, a witness who testifies before a grand jury is required and sworn to tell the truth. The grant of immunity is superimposed upon that requirement. Protection is granted against future injurious use of the incriminating truth that the witness is required to speak, not against prosecution for or the use of any exculpatory falsehood that he may utter to avoid the required admission of wrongdoing. Hence, the immunity statute properly permits prosecution for perjury committed in an otherwise immunized statement and also the introduction in evidence of so much of the statement as is essential to establishing the *corpus delicti*.

474 F.2d at 249.

In sum, we think that both reason and authority compel the conclusion that there was no violation of the appellant's constitutional rights.

### C. *The Statute*

 Section 18 U.S.C. § 1406, the immunity statute in issue here, provided in pertinent part:

> . . . nor shall testimony so compelled be used as evidence in any criminal proceeding (except prosecution described in the next sentence) against him in any court. No witness shall be exempt under this section from prosecution for perjury or contempt committed while giving testimony or producing evidence under compulsion as provided in this section.

Appellant argues that, aside from any constitutional question, the intent of Congress was that the sole remedy of

---

5. Appellant's reliance on Shotwell Mfg. Co. v. United States, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), is misplaced. Appellant urges that the case is authority for the proposition that grand jury evidence, even if false or evasive, is entitled to fifth amendment protection. However, the language re-

lied upon refers to use of compelled testimony in the prosecution of the underlying crime which had been the subject of the investigation, and not, as here, to its use in an unrelated prosecution for perjury. 371 U.S. at 350 n. 10, 83 S.Ct. 448, 9 L.Ed.2d 357.

the Government in the case of false testimony given under the immunity grant is a prosecution for perjury or, if testimony is withheld, for contempt. The statute should not be interpreted to permit the use of the testimony in other criminal trials not based on the original perjurious statements. While this presents a closer question than the constitutional argument discussed above, we do not agree that the Congress intended to so immunize false testimony beyond the protection afforded by the fifth amendment.

In the first place, the question before us is not new. In *Glickstein*, the immunity statute contained no exceptions whatever, and yet the Court held that it did not bar a later criminal action for perjury. At the time of *Glickstein,* the perjury exception had been added to statutes enacted after the one then before the Court, and the argument was made that since no exception had been created in the statute in issue, it was to be presumed that none was intended. In answer, the Supreme Court observed:

> [I]t is impossible in reason to conceive that Congress commanded the giving of testimony, and at the same time intended that false testimony might be given with impunity in the absence of the most express and specific command to that effect.

> Bearing in mind the subject dealt with we think the reservation of the right to prosecute for perjury made in the [later] statutes to which we have referred was but the manifestation of abundant caution, and hence the absence of such reservation in the statute under consideration may not be taken as indicative of an intention on the part of Congress that perjury might be committed at pleasure.

222 U.S. at 143–144, 32 S.Ct. at 73.

The same argument was again made in *Bryan,* where the immunity statute at issue did include an exception for perjury but was silent as to the contempt proceeding. It was urged, therefore, that the Congress only intended to exempt perjury. The Supreme Court once more held that the perjury exemption was added only from superfluous caution. The Court refused to construe the statute to exempt only perjury because to have done so would have simply encouraged the refusal of witnesses to answer questions or to produce papers, which was contrary to the purpose of the statute. 339 U.S. at 342–343, 70 S.Ct. 724. See Heike v. United States, 227 U.S. 131, 141, 33 S.Ct. 226, 57 L.Ed. 450 (1913). Thus, there is square authority in the United States Supreme Court holding that the listing of exceptions in immunity statutes for subsequent criminal prosecutions is not intended to be an exclusive enumeration. The immediate and obvious response intended by Congress to the witness who commits perjury or refuses to answer despite the immunity grant is the perjury or contempt action. While this case presents a situation one step removed from those which faced the Court in *Glickstein* and *Bryan,* we think that the rationale of those cases is dispositive here. The failure to include in the exceptions to the statute the use of false testimony to attack credibility or demonstrate the commission of prior similar acts does not prevent such use. To hold otherwise in this situation, one not readily foreseeable by the legislature, would be to frustrate the purpose which this statute was designed to achieve.

Moreover, the statute speaks of "compelled testimony," and the cases establish that this is the incriminatory truth not otherwise available which is at the heart of the immunity intended to be established by the congressional enactments. We therefore cannot attribute to Congress an intent to limit the use of testimony given in violation of the oath solely to the exemptions set forth in the statute.

Judge Bauman, in a hearing after trial, found that Tramunti's 1966 grand jury testimony was false and evasive. His failure then to remember his own and John Dioguardi's occupations was established to be false by particularly

compelling evidence of perjury. Because it was false, his grand jury testimony was admissible on this perjury trial, not only to impeach his credibility, but also as testimony of prior similar acts. See, e. g., United States v. Berlin, 472 F.2d 1002, 1006 (2d Cir.), cert. denied, 412 U.S. 949, 93 S.Ct. 3007, 37 L.Ed.2d 1001 (1973); United States v. Warren, 453 F.2d 738, 745 (2d Cir.), cert. denied, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972); United States v. Diorio, 451 F. 2d 21, 23 (2d Cir. 1971) (per curiam), cert. denied, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972); United States v. Sweig, 441 F.2d 114, 119 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971); United States v. Courtney, 257 F.2d 944, 946 (2d Cir. 1958), cert. denied, 358 U.S. 929, 79 S. Ct. 316, 3 L.Ed.2d 303 (1959).

### III COLLATERAL ESTOPPEL

■■■■ Appellant argues here and moved below to dismiss the indictment on the ground that prosecution was barred by the doctrine of collateral estoppel. Harris v. Washington, 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971) (per curiam). His acquittal in the Imperial trial, the argument runs, established that the jury in that case had determined the truth of the statements that Tramunti is now charged with having made falsely. Judge Bauman denied the motion to dismiss, this court denied without opinion the application for a writ of prohibition based on the denial of the motion (Tramunti v. Bauman, Docket No. 73–2128) and a petition to the Supreme Court for a writ of certiorari was denied (414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974)).

There is no basic dispute as to the law to be applied here. The double jeopardy clause of the fifth amendment includes within its doctrinal scope the principle of collateral estoppel. Thus, a defendant in a criminal case cannot be convicted on the basis of an issue of ultimate fact which has been determined in the defendant's favor in a prior criminal proceeding involving the same parties. Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951). Where a general verdict was reached in the previous case, a court must examine the record, pleadings, evidence, charge and other pertinent matter in the prior case in order to determine " 'whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " Ashe v. Swenson, supra, 397 U.S. at 444, 90 S.Ct. at 1194.

In order to establish that the present prosecution is barred by the previous acquittal in Imperial, the burden is on the appellant to show that the verdict there *necessarily* decided the issues now in litigation. United States v. Friedland, 391 F.2d 378, 382 (2d Cir. 1968). Since it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant. United States v. Cioffi, 487 F.2d 492, 498 & n. 8 (2d Cir. 1973).

In our view, the defendant has not established that such a situation exists here, and the authorities upon which he relies are distinguishable. In the Imperial trial, the Government attempted to demonstrate that some 10 defendants had engaged in an elaborate conspiracy of securities manipulation and mail fraud.[6] The proof that Tramunti was a conspirator was dependent upon proof that he was present at a luncheon at

---

6. The Imperial indictment charged 16 defendants and 12 other coconspirators with conspiracy and some with additional substantive counts of securities fraud and mail fraud. Tramunti was one of the latter group. With respect to the substantive counts against Tramunti, the Government's theory was that Tramunti was guilty of the conspiracy charge and therefore was responsible for the substantive crimes which were allegedly committed in furtherance of that conspiracy. Pinkerton v. United States, 328 U. S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

Gatsby's Restaurant at which a discussion was held on the subject of producing "front money" to finance the scheme. Two witnesses, Taylor and Kelsey, testified that he was present at the luncheon. The only evidence that he participated in the hatching of the scheme was that he either nodded his head or that he actually stated that he would not put up the money. Tramunti testified that he was not at that luncheon and that he did not know and had never met Taylor or Kelsey. He also denied knowing or meeting Bonadonna or Gugliaro, who, according to the Government, were also at the Gatsby luncheon. He denied knowing or having met Hellerman, although Kelsey testified in the Imperial trial that he and Hellerman had met Tramunti at the Americana. (Hellerman took the fifth amendment at the Imperial trial but was voluble in the trial below.) In essence, appellant argues that the jury's acquittal in the Imperial trial established that he did not lie when he testified that he was not at the Gatsby luncheon and did not know Kelsey, Taylor, Gugliaro and Bonadonna, his alleged luncheon companions. Of course, Tramunti was not charged in the Imperial trial with merely going to lunch at Gatsby's or knowing the individuals he denied knowing, but rather with *conspiracy* to commit a securities fraud and other violations of criminal law. The jury may well have believed that Tramunti knew each of the five men he denied knowing and even attended the luncheon at Gatsby's, but was not guilty of the conspiracy charged. It does not at all follow, as argued by appellant, that the issue *necessarily* decided by the verdict was that Tramunti was not present at the meeting since his presence established his guilt of conspiracy.

The Government case against Tramunti in Imperial was weak at best. Even if he had been present at Gatsby's, the evidence of his knowing participation in a criminal enterprise was feeble. The only evidence of his part in the scheme was either a nod of the head or his comment "No, there will be no front money," which, as his counsel pointed out in summation at that trial, might well have meant that he was disassociating himself from the venture. Defense counsel in that case argued further in summation that Tramunti's knowing the Imperial defendants was hardly enough to establish that he was guilty of conspiracy. The trial court emphasized in his charge to the jury in the Imperial case that mere "knowledge of somebody that another person is doing something illegal . . . is not sufficient to establish membership in the conspiracy." He instructed that the jury must find "that that defendant knowingly and wilfully joined the conspiracy with the specific intent and purpose of furthering its objective. The question is one of intent, and that is one of fact, and that is for you to decide."

In light of the foregoing, it may very well have been that a jury could disbelieve Tramunti's denial that he knew the Imperial defendants, as well as his denial of his presence at the celebrated luncheon, and still acquit him because of the abysmal failure of the Government's proof that this isolated emergence of Tramunti in an intricate scheme established the specific intent necessary for conviction of a conspiracy charge.[7] Certainly, the defendant has failed to show that the jury verdict necessarily demonstrates that the jurors acquitted him because they believed he knew none of the alleged villains and never broke bread with them at Gatsby's.

The cases relied upon by appellant are markedly different. In United States v. Nash, 447 F.2d 1382 (4th Cir. 1971), the defendant had been accused of mail theft. Postal inspectors testified at the trial that they had observed defendant, a post office employee, take from a mail box in the post office an envelope con-

---

7. The defense also argued in the summation that the evidence, if supportive of any finding of conspiracy at all, showed the existence of multiple conspiracies. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

taining a letter, two dollar bills and three 25-cent pieces affixed to a piece of cardboard. The envelope had been placed in the mail box by the inspectors, and the dollar bills and cardboard had been sprinkled with a fluorescent powder. The inspectors followed the defendant into the ladies' rest area and, on searching her, discovered the marked quarters. The defendant testified that she had not taken the envelope and that she had obtained the quarters from a change machine. The jury acquitted defendant of the charge. Thereafter, she was indicted for perjury in the mail theft trial for giving a false explanation of the source of the quarters. In the mail theft trial, there were only two reasonable and conflicting explanations for the undisputed possession of the money to be considered by the jury. On these facts the court concluded: "the jury 'necessarily' had to pass upon the truthfulness of her account. The issue was 'crucial' and once adjudicated, its redetermination in a trial for another offense is estopped." 447 F.2d at 1385. In this case, however, there was no such clash of conflicting explanations. As we have pointed out, the jury here could well have disbelieved Tramunti's denial of his presence at Gatsby's and still have found that his presence was innocent and therefore insufficient to establish the specific intent to conspire which was essential to the Government's case.

In United States v. Drevetzki, 388 F. Supp. 403 (N.D.Ill.1972), the defendant was again initially acquitted of the substantive crime of theft from interstate commerce. The major evidence against him was the testimony of an agent that the defendant had confessed the theft to him. The defendant admitted the conversation but denied the admission of guilt. On his subsequent perjury trial, the court held that the previous acquittal necessarily established that the jury disbelieved the agent's story, since a rational jury could not have accepted the agent's testimony and rejected defendant's and still have reached a verdict of acquittal. Again, the case is inapposite since the crime charged here initially, unlike that in *Drevetzki*, was one of conspiracy, the principal element of which is an intent which was not necessarily established by Tramunti's presence at Gatsby's.

The flaw in appellant's reasoning is that it assumes from the proposition that the Government never could get a conviction without establishing the Gatsby meeting that proof of the meeting alone would establish guilt of the conspiracy. As we have indicated, the Government case required much more than proof of the meeting, where Tramunti was either mute or, at best, opposed to the suggested plan. Even less persuasive is the contention that the jury must have believed Tramunti's denial that he knew the five Imperial conspirators. Acquaintance with the conspirators or even knowledge of what they were up to was, as emphasized by defense counsel, certainly insufficient to establish Tramunti's knowingly entering a conspiracy with them with the intent to commit specified crimes.[8] In fact, the jury only convicted two defendants in the Imperial trial, Alpert and Weiss, who were not shown to have had any particular connection with Tramunti.

Having taken into consideration the record of the Imperial trial, the plead-

8. See United States v. Purin, 486 F.2d 1363, 1369 (2d Cir. 1973), cert. denied, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974); United States v. Fantuzzi, 463 F.2d 683, 690 (2d Cir. 1972); United States v. Cimino, 321 F.2d 509, 510 (2d Cir. 1963), cert. denied, 375 U.S. 974, 84 S.Ct. 491, 11 L.Ed.2d 418 (1964); United States v. Bentvena, 319 F.2d 916, 949 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); United States v. Stromberg, 268 F.2d 256, 267 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); United States v. Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) (L. Hand, J.). The judge in the Imperial trial charged the jury that "mere association of a defendant with an alleged co-conspirator does not establish his participation in the conspiracy, even if you find that there was a conspiracy."

ings, the evidence, the summations and the charge, we conclude that "a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Ashe v. Swenson, *supra,* 397 U.S. at 444, 90 S.Ct. at 1194. We find no error in Judge Bauman's refusal to grant dismissal at the close of the Government's case on the ground of collateral estoppel.

## IV THE BRADY CLAIM

At the trial, the Government called one Gilbert Dragani who testified that he had seen Tramunti in the office of Michael Hellerman in 1970 at a stock closing. Count 1 of the present indictment charged Tramunti with perjury when he denied knowing Hellerman, and hence the testimony was clearly relevant. The Government learned about Dragani when he identified Tramunti from a spread of photographs shown to him while another Assistant United States Attorney was preparing for an unrelated case. Two other people who were at Hellerman's office at the 1970 stock closing, Andrew Nelson and Donald Fisher, were shown the same spread of photographs and were unable to identify Tramunti. The Assistant United States Attorney in the other case did not reveal this non-identification to the prosecutors in the instant case, and it did not become known until after the trial below was concluded. Appellant urges that this non-disclosure precluded a searching cross-examination which would have discredited Dragani's testimony, and that it therefore constituted a denial of due process under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215

(1963). A post-trial motion to set aside the verdict on this ground was denied by the trial judge. We hold that the motion was properly denied since the evidence was not material.

Dragani's identification was only relevant to count 1 of the indictment, which related to Tramunti's denial that he knew or had ever met Hellerman. However, this count was supported by the evidence of Hellerman, Mrs. Hellerman, John Kelsey and Mrs. Kelsey. Their testimony was, to some extent at least, supported by two other witnesses, Bozzi and Barone. In light of this other evidence, we cannot find the non-identification by Nelson and Fisher to be material. Moore v. Illinois, 408 U.S. 786, 798, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Compare Grant v. Allredge, 498 F.2d 376 (2d Cir. 1974). In any event, Dragani's credibility did not remain unscathed. His cross-examination below developed the facts that he had pleaded guilty in a stock fraud case, that he had defrauded the public, that he had received lenient treatment from the Government and that he was anxious to avoid jail. On summation, he was described in extremely harsh terms as a liar with a criminal record.[9] In view of these assaults, it is difficult to see how further ammunition would have been of significance. United States v. Pfingst, 490 F.2d 262, 277 n. 16 (2 Cir. 1973), cert. denied, 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974).

It must also be noted that trial counsel for Tramunti had represented a defendant in the stock fraud case which involved Dragani, Nelson and Fisher. He had received a copy of the indictment in that case and he was on notice

9. Tramunti's counsel made, *inter alia*, the following remarks about Dragani in his summation:

Dragani stands before you as a monument, really, to the lengths that people will go when they are facing jail and they are trying to win the favor of somebody who has an awful lot to say in the sentencing process.

⋅ ⋅ ⋅ ⋅ ⋅

Dragani is charged in 30 counts, 30 crimes, and the Government lets him plead guilty to one.

I ask you and I ask the prosecutor how many crimes, how many felonies, how much lying, how much cheating and deception must a given particular person be guilty of before he really forfeits his right, forfeits his right to be believed by people in a matter as serious and as vital as the one you have before you?

of the basic facts which could have produced this alleged exculpatory testimony. Instead, he chose on summation to call attention to the failure of the Government to call upon other witnesses who could have corroborated Dragani's testimony that Tramunti was at the closing. In view of this, we see no occasion to invoke *Brady*. United States v. Ruggiero, 472 F.2d 599, 604 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L. Ed.2d 398 (1973).

Appellant's other arguments are without merit.

Affirmed.