UNITED STATES of America

v.

Orva Elerson ROBINSON a/k/a Lucky.

Crim. No. Y–75–0709.

United States District Court,
D. Maryland.

July 26, 1976.

John W. Sheldon, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Robert E. Cahill, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

The defendant, Orva E. Robinson, a/k/a Lucky, has been indicted by the Grand Jury for violations of 18 U.S.C. §§ 1621 and 1623, to wit, perjury and knowingly making a false declaration under oath before a court of the United States, following charges of receipt and possession of stolen property with the intent to convert it to his own use and with aiding and abetting in violation of 18 U.S.C. §§ 659 and 2. The defendant allegedly committed perjury and made false material declarations at his trial in June, 1974, which resulted in his acquittal.

The defendant has moved to dismiss the indictment on the ground of collateral estoppel, which is encompassed within the double jeopardy protection of the Fifth Amendment. He asserts that the issues raised in each count of the indictment were adjudicated adversely to the Government by the jury's verdict in the earlier case, *United States v. Robinson*, Criminal No. M–74–0162. As another ground, the defendant moves to dismiss Counts One and Two of the indictment because the witness' answers were unresponsive and ambiguous. The Government has opposed the motion, arguing that the issues raised in each count of the indictment were not adjudicated and were not adjudicated adversely to the Government by the verdict in the earlier case. The Government also opposes the other ground to dismiss the indictment, but, because of the resolution reached under the first ground, there is no need to discuss this issue.

That the principle of collateral estoppel applies to federal criminal cases has

long been settled. *See Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), *Sealfon v. United States,* 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948). As stated in *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194:

[I]t stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

■ The Court in *Ashe* set forth the manner in which this Court is to proceed in determining whether collateral estoppel bars the bringing of this indictment, stating:

The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 240, 92 L.Ed. 180. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.

*Ashe v. Swenson, supra* at 444, 90 S.Ct. at 1194.

Both parties agree that Judge Marovitz applied the principle in a thorough and well-reasoned manner in *United States v. Drevetzki,* 338 F.Supp. 403 (N.D.Ill.1972). There the court stated at 406–407:

A subsequent charge of perjury in regard to testimony relating to a prior offense, however, creates problems not present in the former type of case. The alleged offense occurs at trial, some time after the commission of the substantive act, and relates to rather than arises from that act. It therefore proves more difficult to discover whether indeed the acquittal of a defendant at a trial at which the perjured testimony was given fully determined and decided the issue of whether the defendant's testimony was indeed perjured since the charged offense rather than the issue of his credibility was directly in issue. Furthermore, an additional policy consideration is injected. As the court stated in *Adams v. United States,* 287 F.2d 701 (5th Cir. 1961) at 703:

"Two opposing policy considerations have weighed heavily in prior determinations of this problem. On the one hand the concern exists that allowing an acquittal to afford any sort of insulation for perjury will be giving defendants an uncontrollable license to testify falsely. The resulting detriment to the reliability of evidence and more so, to the stability of the judicial process, would only be enhanced by the obvious fact that the more persuasively flagrant the defendant's fabrication, the greater his chances of total exoneration. This completes a vicious circle since the successful acquittal on the substantive offense would immunize him as to the very falsehoods which brought it about. On the other hand some apprehension exists that allowing prosecution for perjury will actually give the state a second shot at the defendant for the same wrong. The mere fact, this argument continues, that one charge relates to the doing of an act and the other to a denial of having done it, or to affirmative proof that it was not so done, is not sufficient basis on which to make a distinction. This is particularly true where the

same or substantially the same evidence is presented in both cases."

Then the court applied the test set forth in *Ashe* and found that the indictment for perjury was barred by the doctrine of collateral estoppel because the truth of the defendant's testimony regarding his statement to a FBI agent was fully litigated and decided in the earlier trial. In some detail the court stated at 408:

> We believe that a rational jury could not have found Defendant not guilty had they believed the agent's testimony rather than the Defendant's. The testimony of an F.B.I. agent regarding a statement of admission made by a Defendant is bound to have a profound effect on the minds of a jury. The fact that a jury found the Defendant not guilty in spite of that testimony indicates that they considered both statements and chose to believe Defendant's statement over that of the agent. A jury could not have reached its conclusion without considering that issue. The finding of not guilty is therefore the same as determining that the statement of admission was not made to the agent and that issue cannot be again litigated. Thus the perjury indictment fails the *Ashe v. Swenson* test.

This principle has also been applied by the Fourth Circuit in *United States v. Nash*, 447 F.2d 1382 (1971). There, Estelle Nash, having been acquitted of mail theft charges, was indicted for perjury at her trial on the mail theft charges. At her trial she testified that she had obtained the money that the Government said she had stolen from the mails from a change machine at the post office. The Fourth Circuit held that her prosecution for perjury was prohibited by the double jeopardy provision of the Fifth Amendment, and suggested certain guidelines to be followed, at 1384–85:

> Double jeopardy is a constitutional bar not only to retrial for the same offense, but also to relitigation of adjudicated issues whether they emerge in trials for the same or distinct offenses. Cf. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 239, 92 L.Ed. 180 (1948), instructs that the determination "depends upon the facts adduced at each trial and the instructions under which the jury arrived at its verdict at the first trial". This distillation precipitates what "at each trial was crucial to the prosecution's case and which was *necessarily adjudicated* in the former trial". If it is identical the Government is estopped by the prior determination from proceeding with the second prosecution.

The defendant argues that these directions preclude the present prosecution. The Government contends that these cases should not be read as broadly as the defendant wishes and that they are distinguishable. Further, the Government relies on two cases decided by the Second Circuit where *Nash* and *Drevetzki* were distinguished. See *United States v. Gugliaro*, 501 F.2d 68 (2 Cir. 1974); *United States v. Tramunti*, 2 Cir., 500 F.2d 1334, *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667 (1974).

In *Tramunti* the defendant, after being acquitted at his earlier trial of conspiracy and of substantive counts of securities and mail fraud, was charged with six counts of giving false information under oath. At that trial he testified he had not been present at a meeting and that he did not know or had never met five individuals. The Second Circuit stated the test of collateral estoppel as given in *Ashe* and elaborated that the burden was on the defendant "to show that the verdict [at the earlier trial] *necessarily* decided the issues now in litigation." *Tramunti* at 1346. The Court reviewed the earlier case and found that the Government's case against Tramunti was weak at best. Thus, the court concluded "it may very well have been that a jury could disbelieve Tramunti's denial . . . and still acquit him because of the abysmal failure of the Government's proof [to establish] the specific intent necessary for conviction of a conspiracy charge." *Tramunti* at 1347. See also *United States v. Gugliaro*, 501 F.2d 68 (2d Cir. 1974).

■ Having carefully reviewed the transcript and the requested jury instructions in *United States v. Robinson*, Crim. No. M–74–0162, and following the suggested guidelines, the Court finds that the United States is collaterally estopped from bringing this indictment against Robinson.

In the original case the primary testimony against Robinson was that of Maceo Clerkley, a co-defendant with Robinson who had plead guilty. Clerkley testified that Robinson approached him about investing some money to purchase some appliances which would later be resold for a profit. Clerkley made Robinson the leader of this scheme to make a profit from stolen appliances.

Robinson took the stand in his own behalf and put the blame for the operation squarely on the shoulders of Clerkley. He denied ever following a tractor-trailer in Clerkley's car with Clerkley and Walter Barnett. He stated that Clerkley approached him about the deal, that he did not approach Clerkley. Further, he stated that he got out of the deal a few days after it had begun when he learned there was no bill of sale for the appliances. Clerkley, on the other hand, had stated that Robinson did not get out of the deal until a month later for personal reasons, "that he didn't want any more bother." (Tr. 232).

However, when asked on cross-examination if he recognized an individual in a picture, later identified to be one of Walter Barnett, Robinson stated that he did not recognize that person. Later, on re-direct examination, Robinson was asked if that was a picture of a man who attended a conference at the office of his attorney, Mr. Walker. He responded, "I don't know, it could be. I don't know. I couldn't say."

Clerkley had testified that Barnett was with Robinson and him when they followed the tractor-trailer and that Barnett was with them at a meeting at Suburban Kitchens where the appliances were stored.

The Government called as its only rebuttal witnesses Clerkley and Mr. Kaminkow, Clerkley's attorney. Both testified that they had attended a meeting at Mr. Walker's office at which Barnett and Robinson were present. Mr. Kaminkow testified that it was Robinson who introduced him to Barnett, who was then being referred to as Mr. X.

In summation, the Government stressed this meeting at Mr. Walker's office and the evidence. indicating that Robinson had lied about knowing Barnett. The Government argued that Robinson having lied about knowing Barnett must have concocted the whole story. Again during rebuttal the Government stressed the evidence indicating Robinson had lied about Barnett and referred to the Latin phrase, *Falsus in Uno Falsus in Omnibus*, mentioned by Mr. Walker during his closing argument. Both attorneys told the jury during closing argument that the judge would instruct the jury on that point.*

Taking the rational and realistic approach advocated by the Supreme Court in *Ashe*, this Court finds that the jury, in acquitting Robinson of receipt and possession of stolen property with the intent to convert it to his own use and of aiding and abetting, must necessarily have decided that Robinson was telling the truth when he stated he did not know the individual in the photograph shown him. The Government made Robinson's knowledge or lack of knowledge of Barnett an extremely important and crucial

---

* Unfortunately the jury instructions have not been transcribed. Thus, it is impossible to know if Judge Miller did instruct the jury on this point. The requested instructions in Crim. No. M–74–0162 were available to this Court, but neither party specifically requested in writing such an instruction. The Government did request that the Court give its general instruction on credibility. The following is a proper instruction: "If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness' testimony in other particulars; and you may reject all the testimony of that witness or give it such credibility as you may think it deserves." Devitt & Blackmar, *Federal Jury Practice and Instructions*, § 12.05. Since both parties stated that the Court would give such an instruction and it is a proper one, this Court assumes that such a charge was given to the jury.

fact. The only rebuttal witnesses put on by the Government stated that Robinson was with Barnett at a meeting in Mr. Walker's office. The only purpose of this testimony was to attack the credibility of Robinson and the Government stressed this testimony in its closing argument. The Government attempted to destroy all of Robinson's testimony by urging the jury to believe that he had lied about Barnett. It failed and it may not try to convince another jury that he had lied about his knowledge.

This case is unlike all the cases cited by both sides. In *Drevetzki*, the defendant denied making an oral confession to an FBI agent, who had testified that he had. Clearly there the jury must have believed the defendant and not the agent to have acquitted him. In *Nash*, the defendant denied any involvement in the alleged mail theft, and stated that the marked quarters found in her possession came from the change machine in the ladies' restroom. Again, the jury must have believed her explanation of the marked quarters.

*Tramunti* and *Gugliaro*, relied on by the Government, appear at first glance to resemble more closely the facts here. There each defendant had been acquitted of conspiracy charges, during the trial of which each denied knowing or meeting with the other co-conspirators. The Court in *Tramunti* stated at 1347, "The jury may well have believed that Tramunti knew each of the five men he denied knowing and even attended the luncheon at Gatsby's, but was not guilty of the conspiracy charged." To have convicted the defendant the jury had to find specific intent to join the conspiracy. The Government might have argued here that the jury may well have believed that Robinson knew Barnett but was not guilty of the offense charged because he did not have the knowledge that the appliances were stolen. However, since the Government in reality attempted to make its case by demonstrating that Robinson had lied about knowing Barnett, this Court finds that *Tramunti* and *Gugliaro* are not controlling and that the jury must have believed Robinson.

This Court is concerned that allowing an acquittal to afford any sort of insulation for perjury will be giving defendants an uncontrollable license to testify falsely. However, this Court cannot allow the Government, by bringing an indictment for perjury, a second shot at a defendant for the same wrong.

Accordingly, it is this 26th day of July, 1976, by the United States District Court for the District of Maryland, ORDERED:

1. That the defendant's motion to dismiss the indictment be, and the same is, hereby granted; and

2. That Criminal No. 75–0709 be, and the same is, hereby dismissed.