COMMONWEALTH vs. JAMES MITCHELL.

Middlesex.    February 9, 1983. — April 1, 1983.

Present: GRANT, KAPLAN, & GREANEY, JJ.

*Perjury.*

In the circumstances, false testimony by the defendant at a trial on a charge of distributing heroin, of which he was acquitted, stating that he was married to the woman he was living with was not so material as to warrant his conviction of perjury. [581-583]

INDICTMENT found and returned in the Superior Court Department on December 11, 1979.

The case was tried before *Frederick T. Doyle*, J., a District Court judge sitting under statutory authority.

*Daniel E. Callahan* for the defendant.

*Jeffrey A. Newman*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. James Mitchell was tried in May, 1978, on a charge of distributing heroin on February 2, 1978. The jury brought in a verdict of not guilty. Some nineteen months later, in December, 1979, Mitchell was indicted for perjury (G. L. c. 268, § 1)[1] committed by him at that trial,[2] in that he falsely stated on oath, when testifying as a witness in his own behalf, that he was the father of four children, was living with Ethel Davis (Mitchell) at One Gavin Terrace,

---

[1] Section 1 provides in part: "Whoever, being lawfully required to depose the truth in a judicial proceeding or in a proceeding in a course of justice, wilfully swears or affirms falsely in a matter material to the issue or point in question, or whoever, being required by law to take an oath or affirmation, wilfully swears or affirms falsely in a matter relative to which such oath or affirmation is required, shall be guilty of perjury."

[2] The defendant moved for dismissal of the perjury indictment for undue delay in procuring it, but his application was denied.

Lowell, and was married to Ethel. Upon trial of the perjury charges in November, 1981, the judge dismissed the charges on the first two statements as having failed of proof by the prosecution, but he denied Mitchell's motion for a required finding of not guilty as to the third statement about marriage; and of that charge of falsity the jury found Mitchell guilty. Mitchell appeals from the judgment of conviction, claiming error in the denial of his motion.

After much hesitation and some reversals of position, the trial judge admitted in evidence and made available to the jury the transcript of evidence in the prior drug case, consisting of 258 pages, with opening and closing speeches of counsel, but omitting the judge's instructions.[3] This was presumably in obedience to *Commonwealth* v. *McDuffee*, 379 Mass. 353 (1979), declaring "materiality" to be an issue for the jury like other issues of fact, with the usual power of control by the judge. *Id.* at 364-366, 367 n.13. Counsel, however, were permitted to read out to the jury portions of the transcript deemed by them to be pertinent, and much of the perjury trial consisted of these readings.

In the drug case the Commonwealth sought to prove that on February 2, 1978, sometime between 1:30 and 2:30 P.M., one Angel Garcia purchased from Mitchell at Omer's Cafe in Lowell two bags of heroin for the price of $80.[4] According to prosecution evidence, Garcia (a drug addict acting as informer), Estaban O'Rama (a paid informer), and Hector Cora met on February 2 with Inspector Bernard LeMoine and other officers at the Lowell police department; they

---

[3] At first the judge thought use of the drug record should be confined to the testimony of the defendant; then he inclined to admit the testimony of the principal witnesses; then he yielded to the introduction of the whole transcript of testimony apart from the closing speeches; finally he let in those as well. (Curiously, exhibits admitted in the drug case were not given to the jury in the perjury case.) The defendant objected repeatedly but suggested no definite course. See note 13, *infra*.

Consideration of this problem of the handling of the record of the prior trial, which is particularly important under the *McDuffee* rule, should preferably occur before trial and with the cooperation of counsel.

[4] This was the price Garcia testified to at trial, but he mentioned a different price to the grand jury. Inspector LeMoine testified before the grand jury to a third price.

were searched for drugs with negative results;[5] and proceeded by automobile to Omer's followed by LeMoine in another car.[6] Mitchell's Lincoln Mark V automobile with a distinctive plate was parked outside Omer's. Garcia testified that he and Cora entered the place, the time appearing to be between 1:30 and 2:00 P.M.; Cora pointed to Mitchell, who was playing pool, as a likely seller; and Garcia bought from Mitchell two of the several bags Mitchell took from his belt and threw on the pool table. Shortly Garcia and Cora left and returned to the car; they met LeMoine at a nearby parking lot and handed him the bags whose contents proved out as heroin when analyzed.

For the defense, Mitchell testified that after working the night shift at the Pandel Bradford plant in Lowell, he drove that morning about 8:30 A.M. in his car to Omer's; stopped there briefly; went on and had breakfast at Ethel's apartment at One Gavin Terrace, which he called home; about 11:00 A.M. picked up his son at kindergarten and delivered him to a babysitter's house; returned to Omer's where he met his friend Luther Lucas, who drove him home in the car and then, by prearrangement, borrowed the car. Mitchell said that, arriving finally at home about 12:30 P.M., he went to bed and slept, awakening around 4:30 P.M. when Ethel returned from her workday at Raytheon. Thus he was not at Omer's at the crucial time.

By way of preliminary, Mitchell testified that he was married to Ethel, and it was shown that their annual salaries were about $17,000 and $10,000 respectively. Ethel testified in confirmation of Mitchell. The personnel manager at Pandel Bradford, where Mitchell had worked for more than eight years, currently as a compound foreman, gave reputation testimony for him, as did the minister of his church.

---

[5] All three were searched (inadequately, the defendant urged), but the automobile in which they went to Omer's was not. LeMoine stated, however, that this vehicle came from a dealer.

[6] Garcia swore that the three had no instructions to go to Omer's but that he, Garcia, informed Inspector LeMoine that they would go there.

Through cross-examination of Garcia (still as read from the drug trial), Mitchell's counsel brought out that in February, 1978, Garcia had complaints outstanding against him on twenty-two criminal charges (including unlawful possession of, and possession with intent to distribute heroin), and an additional four charges of violations of probation. After Garcia's cooperation with the police was brought to judicial attention, he received concurrent sentences on all the cases of no more than one year's imprisonment. Developed further were some inconsistencies between Garcia's grand jury and trial testimony,[7] and the circumstances that neither O'Rama nor Cora was called as a witness (nor was any of the dozen or so persons present at Omer's); that marked bills were not used; and that there was a space of three weeks after the alleged event before Mitchell was arrested. LeMoine was challenged in cross-examination and by testimony of Mitchell as having been trying to "get" Mitchell over an extended period of time.[8] Defense counsel in his closing spoke of Mitchell as a hard working family man, with good income, vouched for by his employer and minister — not the kind of person who would traffic in drugs.

All the foregoing entered into the perjury trial. As noted, at that trial there was a lack of proof of falsehood in the statements about children and residence, but the prosecution did show that Mitchell was not lawfully married to Ethel. He had married another woman, Barbara Mitchell, in 1966; however he had been estranged from Barbara since 1969. He was the defendant in a divorce action by Barbara commenced in February, 1981, in which a judgment nisi entered in May, 1981.[9] There was no doubt of Mitchell's

---

[7] The inconsistencies went to Cora's participation, and to the extent of Garcia's prior familiarity with Mitchell. See also note 4, supra.

[8] Compare note 6, supra.

[9] Barbara asserted at voir dire a spousal privilege and she did not testify at trial. Ethel was not accorded a voir dire and the jury heard her claim a privilege against self-incrimination which was allowed. Proof of the marital situation was made in other ways.

intimacy with Ethel over a considerable period; indeed the prosecuting attorney was herself prepared to go so far as to say they may have been "living together" at various times. The falsity thus lay essentially in the particular assertion of a solemnization of marriage, which might enhance implications of economic stability and domesticity (fitting the picture, say, of the 4:30 P.M. awakening at home) and so in some measure strengthen Mitchell's credibility.

The Commonwealth's burden — as the judge recognized in his main charge — was to establish beyond a reasonable doubt that the false statement was "material" in the sense of having a "'reasonable and natural tendency' to influence the pertinent determination." *Commonwealth* v. *McDuffee*, 379 Mass. at 365; see *Commonwealth* v. *Giles*, 350 Mass. 102, 111 (1966); *Commonwealth* v. *Cerveny*, 373 Mass. 345, 352 (1977); *Commonwealth* v. *Borans*, 379 Mass. 117, 136 (1979); *Commonwealth* v. *Perreault*, 13 Mass. App. Ct. 1072, 1073 (1982). This standard is perhaps necessarily, but nevertheless regrettably vague, and decision must proceed ad hoc. In the present case, when we consider the whole complex of the evidence, any relation of Mitchell's assertion of official marriage to the drug jury's determination appears to rest so far in "surmise, conjecture, or guesswork" (*Commonwealth* v. *Kelley*, 359 Mass. 77, 88 [1971]) that we think the question of materiality should properly have been withdrawn from the jury and the case accordingly dismissed.[10] To be sure, falsehoods going to credibility of a witness may at times figure as material for purposes of the crime of perjury. See *Blackmon* v. *United States*, 108 F.2d 572, 573-574 (5th Cir. 1940). But not so in this particular case of a lie about a certificate of marriage. Compare *State ex rel. Engebritson* v. *Circuit Court for Grant & Day Coun-*

---

[10] The jury after deliberating for a time asked for a redefinition of "materiality" and it is unfortunate that the judge at that critical point did not reiterate the requirement that materiality (as defined) be proved beyond a reasonable doubt. There was, however, no protest by defense counsel about that omission. He did demand a mistrial on the ground that the jury seemed much confused.

*ties,* 69 S.D. 454, 459-560 (1943) (in prosecution for obtaining money by false pretenses, defendant's false statement that he was married was not material for purposes of later trial on perjury charge); *Beckanstin* v. *United States,* 232 F.2d 1, 3-4 (5th Cir. 1956) (statement by plaintiff in civil suit involving a house built by him as contractor, that he was a graduate of the M.I.T. architectural school, when he had only attended there, considered immaterial in perjury prosecution). Cf. *Luna* v. *Beto,* 395 F.2d 35, 39 (5th Cir. 1968), cert. denied, 394 U.S. 966 (1969).

If the conclusion we think warranted could be considered doubtful as applied to an ordinary witness charged with similar false testimony, it is greatly reinforced in this case where the witness was the very defendant found innocent in the action in which he gave the testimony. As courts early observed, the notion of materiality is not unitary, it is much affected by the context. See *United States* v. *Lamson,* 165 F. 80, 84 (D.R.I. 1908). See also *United States* v. *Alu,* 246 F.2d 29, 32-33 (2d Cir. 1957). In the situation of an acquittal followed by charges of perjury against the defendant, we have reason to be circumspect about finding materiality sufficient to allow a jury to convict. Judge John R. Brown put the problems of policy thus in *Adams* v. *United States,* 287 F.2d 701, 703 (5th Cir. 1961); "On the one hand the concern exists that allowing an acquittal to afford any sort of insulation for perjury will be giving defendants an uncontrollable license to testify falsely. The resulting detriment to the reliability of evidence and more so, to the stability of the judicial process, would only be enhanced by the obvious fact that the more persuasively flagrant the defendant's fabrication, the greater his chances of total exoneration. This completes a vicious circle since the successful acquittal on the substantive offense would immunize him as to the very falsehoods which brought it about. On the other hand some apprehension exists that allowing prosecution for perjury will actually give the State a second shot at the defendant for the same wrong. The mere fact, this argument continues, that one charge relates to the doing of an act and the

other to a denial of having done it or to affirmative proof that it was not so done, is not sufficient basis on which to make a distinction. This is particularly true where the same or substantially the same evidence is presented in both cases. . . . This, we see, approaches closely, whether acknowledged or not, an intuitive feeling akin to double jeopardy despite the fact that the two are distinct." See also *United States* v. *Robinson*, 418 F. Supp. 121, 123, 126 (D. Md. 1976).[11]

The present case illustrates the danger of harassment, of mounting a retrial, in effect, of the initial prosecution, in the guise of a trial of perjury. A hint of the vice appeared in the plausible suggestion on the argument of this appeal that, had Mitchell been found guilty of the drug charge, he would not have been prosecuted for perjury. So also the vice is seen in the Commonwealth's election to read passages of the transcript of the drug trial that tended in the direction of proving Mitchell guilty of distributing heroin but had little bearing on the alleged perjury.[12] As was said in *Harrell* v. *United States*, 220 F.2d 516, 520 (5th Cir. 1955), "It is true that in cases where the defendant in perjury was himself the defendant in the former trial, the admission of testimony taken at the former trial may introduce into the trial of the perjury charges highly prejudicial evidence tending to show the commission of other crimes."[13]

---

[11] Civil law countries do not administer an oath to a criminal defendant and thus he is freed of the threat of prosecution for perjury for testimony he may give in his own behalf. Silving, The Oath: II, 68 Yale L.J. 1527, 1533-1535 (1959). This concedes something to human frailty — the temptation of an accused to shave the truth in order to save himself — and rests in part also on considerations suggested in the passage quoted above from the *Adams* case.

[12] Thus the prosecution's emphasis on a part of the drug transcript showing some difficulties in squaring Lucas's borrowing the defendant's car with its appearance outside Omer's about the time the alleged sale took place.

[13] It should be observed that while care was taken in the present case to excise bench conferences, etc., from the portions of the drug transcript read to the jury, there was no such sanitizing of the entire transcript

We are not to be understood as minimizing the seriousness of the crime of perjury, the first listed in chapter 268, "Crimes Against Public Justice." Nor are we intimating that an acquittal in a criminal proceeding is a virtual bar to an accusation of perjury against the defendant for his or her testimony given therein.[14] We do say that caution is called for in any such case; and the consequence in the particular predicament of the instant case should be reversal of the conviction for error in the denial of the motion for a required finding.

*Judgment reversed.*

*Verdict set aside.*

*Judgment for the defendant.*

---

which passed to the jury. For example, the transcript contained an irrelevancy about LeMoine's attempt to arrest Lucas on separate charges.

[14] The question of the operation of an acquittal as a collateral estoppel in a further prosecution of the same person, as in *Ashe* v. *Swenson*, 397 U.S. 436, 444 (1970), is to be distinguished from the present question.